# Court of Appeals
## Tenth Appellate District of Texas

10-24-00326-CV

In the Interest of B.S. and R.S., Children

On appeal from the
413th District Court of Johnson County, Texas
Judge David A. Barkley, presiding
Trial Court Cause No. DC-D202301001

CHIEF JUSTICE JOHNSON delivered the opinion of the Court.

## MEMORANDUM OPINION

Following a bench trial, the parental rights of D.S. (Father) and T.S. (Mother) were terminated. The trial court found by clear and convincing evidence that both Father and Mother had violated Family Code subsections 161.001(b)(1)(D), (E), and (O) and that termination was in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b). Father and Mother appealed. We will affirm.

## Mother's Appeal

Mother raises six issues in her brief. In her first five issues, she contends that the evidence was legally and factually insufficient to support the trial

court's termination findings. In her sixth issue, she contends that the trial court erred in denying her motion to extend the dismissal deadline of the case.

## A. Sufficiency of the Evidence

The standards of review for legal and factual sufficiency of the evidence in cases involving the termination of parental rights are well established and will not be repeated here. *See In re J.F.C.*, 96 S.W.3d 256, 264–68 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency). The trial court, as factfinder, is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

Mother argues in her brief that the standard of review should be changed in parental termination cases because we "should find that the standard of proof required for parental termination is 'beyond a reasonable doubt.'" However, as an intermediate appellate court, we must follow the precedents of the Texas Supreme Court until the highest court overrules them or the Texas Legislature supersedes them by statute. *See Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 565 (Tex. App.—Austin 2004, no pet.).

### 1. Predicate Violations

In her first, second, and third issues, Mother contends that the evidence was legally and factually insufficient to support the trial court's findings that she violated Family Code subsections 161.001(b)(1)(D), (E), and (O), and in her fourth issue, Mother contends that the evidence was legally and factually

insufficient to support the trial court's finding that Family Code subsection 161.001(d) did not preclude termination of her parental rights under subsection 161.001(b)(1)(O). We begin with Mother's argument that the evidence was legally and factually insufficient to support the trial court's finding that she violated subsection (E).

Termination under subsection (E) requires clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). To "endanger" means to expose the child to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The relevant inquiry under subsection (E) is whether sufficient evidence exists that the endangerment of the child's well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied).

Scienter is not required for a parent's own acts to constitute endangerment under subsection (E). *See In re L.S.*, No. 10-22-00119-CV, 2022 WL 3655395, at *2 (Tex. App.—Waco Aug. 24, 2022, no pet.) (mem. op.). It is also not necessary to show that the parent's conduct was directed at the child or that the child suffered actual injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from the parent's misconduct

alone. *Id.* Furthermore, in an analysis under subsection (E), we may consider conduct both before and after the child's removal. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

The relevant evidence presented in this case was as follows: Alejandro Torres, a Family-Based Safety Services (FBSS) caseworker for the Department of Family and Protective Services (DFPS) in Johnson County, testified that he first received this case at the beginning of October 2023 from Cook County FBSS. Cook County had become involved with this family based on concerns that the family was living in a home without working utilities and based on concerns about Mother's and Father's mental health and history of substance abuse. Just after Torres received the case, DFPS in Johnson County then received a report that Father had slit his wrists. Law enforcement was contacted and responded, but when they encountered Father, they did not observe any suicidal behaviors. Father also reported that he was not suicidal, and when Torres saw Father, Torres did not observe any cuts on him. DFPS investigator Chanci Latson testified that she nevertheless began an investigation at that time because in addition to the allegation about Father slitting his wrists, there were concerns about the family's home environment and about there being severe sores on the children's legs. B.S. was three years old, and R.S. was one year old at the time.

Latson testified that she first visited the family's home on October 9, 2023. The family was living in a "run-down RV" belonging to Mother's aunt. Mother's aunt explained to Latson that she had seizures and that the family had come to help her with her medical issues. During Latson's visit to the home, she observed that the children had sores all over their legs and that the sores appeared to be infected. Torres likewise testified that he was very concerned about the children at that time because the infected sores were black. Latson spoke with Mother about the sores, and Mother stated that the sores had not been treated. Latson therefore told Mother that the children needed to be taken to the emergency room. Mother initially responded that the emergency room would not see the children because it was not a medical emergency, but Latson insisted that the children's condition was a medical emergency and that they needed to be seen that day.

Latson testified that the next day, she checked to make sure that the children had received medical treatment. Mother reported that she had not taken the children to the emergency room right away because she had run out of gas. Latson later found out, however, that Mother had been able to go to the convenience store to buy cigarettes. Torres explained that he had left the home to go get the family a car seat so that they could go to the emergency room but that when he returned to the home with the car seat, Mother and Father had left. Only Mother's aunt remained at the home with the children. When Torres

asked Mother's aunt where Mother and Father had gone, she replied that they were out getting cigarettes at the gas station.

Torres testified that Mother and the children were nevertheless eventually taken to the emergency room by a Human Services Technician, a case aide that assists with tasks such as transport. Latson testified that when the children were seen in the emergency room, it was determined that the sores were caused by bug bites that had developed staph infections. The infections required medical treatment, and once treated, the sores resolved. When asked at trial if there was any delay in getting medication for the children, Torres responded that there was not. Still, Latson testified that she had serious concerns because Mother knew the children had infections yet made the decision to go to the store to buy cigarettes instead of taking her children to the hospital.

Latson testified that there were also concerns about the family's home environment. Latson learned that at the time of her October 2023 visit, six people were living in the "run-down RV" belonging to Mother's aunt. In addition to Mother, Father, B.S., R.S., and Mother's aunt, an eighteen-year-old brother of the children, T.S., was living there as well. Latson explained that Mother and Father have had a total of thirteen children, including T.S., B.S., and R.S., but that Mother and Father do not have possession of any of their other children. T.S., as an eighteen-year-old, had chosen to come back to live

with Mother and Father. Mother's and Father's previous interactions with DFPS date back to 2008. In many of those cases, Mother and Father were uncooperative with DFPS. The cases also included physical neglect and seemed to Latson to have a pattern that was repeating itself.

Latson continued by testifying that the RV was "[n]ot exactly" sufficient space for six people. Latson explained that there was very little room in the RV and that the sleeping conditions for the children were "[n]ot great." Mother's aunt stayed in the bed in the back room of the RV. B.S. slept on a pull-out couch with T.S., and R.S. slept in a playpen. Latson acknowledged at trial that a playpen is an appropriate sleeping place for a child of R.S.'s age, but Latson explained that the playpen had a hole in it, that it was dirty, and that there were blankets all in it.

Latson further testified that there were concerns about the safety of the home for the children. The RV was dirty and cluttered. Medications and cleaning supplies had been left out such that the children could have gotten into them. Torres also described multiple holes in the ceiling of the home and a hole in the floor that was covered with plywood. Similarly, Latson described a large hole in the roof of the RV. Mother's aunt initially told Latson that the preacher was coming to patch the hole in the roof; therefore, DFPS gave Mother and Father some time to have the repairs done, but when Latson visited the RV again, the preacher had not repaired the RV's roof. It had also

been raining quite a bit when Latson visited the RV again, and the family had placed a plastic tote under the hole in the roof to catch the rainwater. Torres described the water in the tote as being over a foot high, and Latson described the water as looking rusty and dirty. Latson also testified that the situation posed a drowning threat because of B.S.'s and R.S.'s ages. Specifically, Latson explained that because there was a hole in the playpen where R.S. slept, R.S. could potentially get out of the playpen and get into the tote during the middle of the night. Latson confirmed that R.S. was "getting around" and crawling at that time, and Torres stated that Mother had told him that R.S. had tried to get into the water.

Latson testified that she ultimately requested that B.S. and R.S. be removed from Mother's and Father's care and be placed in the temporary managing conservatorship of DFPS after she asked the parents to take a drug test. Father initially refused to take a drug test. Mother agreed to take a drug test and tested positive for methamphetamines and amphetamines. Mother then admitted to Latson that she had used methamphetamines after an altercation between her and Father. Mother also told Torres that Mother's aunt was under the influence of methamphetamines.

Latson testified that soon after the children's removal, Father then participated in drug testing as well. Father's urinalysis results were negative, but his hair-follicle test results were positive for methamphetamines and

marijuana. Erin Khan, the primary caseworker after the adversary hearing, testified that the children were therefore ordered at the adversary hearing to each be given a hair-follicle drug test. The drug tests were performed in November 2023, a couple of weeks after the children were removed from Mother's and Father's care. R.S. tested positive for methamphetamines at that time.

Khan further testified that when she first became the primary caseworker, she met with the family to develop a service plan for Mother and Father. Mother and Father cooperated with her in making the service plans, and after Mother's service plan was developed, Mother did begin working on completing her services. Mother began attending intimate partner violence classes and anger management. Mother completed her psychological evaluation, attended her mental health assessment, and started substance abuse counseling. After initially testing positive on her hair-follicle drug test in November 2023, Mother tested negative on all further drug tests. Moreover, Mother told Khan that she was employed "doing like handyman jobs," and Mother was twice able to provide proof of income from her employment.

Khan also testified, however, that after Mother attended her mental health assessment, Mother was referred for certain services but was not consistent with following up with those services. Similarly, Mother started substance abuse counseling but was twice discharged after missing several

classes. Additionally, Mother moved from the RV to a home where she was living with her boss, but according to Khan, Mother's boss's home was not an acceptable place for Mother to live. Khan described the home as having no ceiling. Kahn stated, "They were sort of trying to replace the ceiling." Khan also described the home as having a very strong odor and having so many items outside that it looked like a hoarder's house.

Kahn then testified that at the end of March or beginning of April 2024, Mother started a new job. But in April 2024, Mother's boss contacted Kahn and told her that Mother no longer lived in the home with him and was instead living with Father in a tent outside of the home and using water and electricity from the home. Mother was then incarcerated in April 2024 after working at her new job for only about three weeks, and she remained incarcerated at the time of trial in October 2024. Mother told Khan that while she was incarcerated, she was working on some parenting classes and substance abuse classes, but the last visit that Mother had with B.S. and R.S. was on April 10, 2024.

A parent's drug use may support termination under subsection (E). *See J.O.A.*, 283 S.W.3d at 345; *see also In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024). Additionally, while mere imprisonment, standing alone, will not constitute engaging in conduct that endangers the emotional or physical well-being of a child, it is an appropriate factor to weigh when considering

endangerment. *In re J.F.-G.*, 627 S.W.3d 304, 312–13 (Tex. 2021). Furthermore, many factors can support an endangerment finding, including a parent's failure to complete a court-ordered service plan, missed visits with the child, and conduct that generally subjects a child to a life of instability and uncertainty. *In re A.R.M.*, 593 S.W.3d 358, 371–72 (Tex. App.—Dallas 2018, pet. denied) (mem. op.).

Here, the evidence showed that when DFPS became involved with this family, B.S. and R.S. had severe, visible sores on their legs that Mother had yet to treat. Additionally, before the children's removal, Mother tested positive for methamphetamines and amphetamines and admitted that her aunt, with whom Mother and the children were living at the time, was also under the influence of methamphetamines. Mother further failed to complete her service plan. Notably, Mother was twice discharged from substance abuse counseling after missing several classes. Finally, Mother became incarcerated in April 2024 and remained incarcerated at the time of trial in October 2024.

Considering the foregoing, we conclude that the evidence was legally and factually sufficient to establish that Mother engaged in conduct that endangered the physical or emotional well-being of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Moreover, having concluded that the evidence was legally and factually sufficient to support the trial court's finding that Mother violated subsection (E), we need not address Mother's arguments that

the evidence was legally and factually insufficient to support the trial court's findings that she violated subsections (D) and (O) and that subsection 161.001(d) did not preclude termination of her parental rights under subsection (O).  *See In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam).  We overrule Mother's first, second, third, and fourth issues.

## 2.    Best Interest of the Children

In her fifth issue, Mother contends that the evidence was legally and factually insufficient to support the trial court's finding that termination was in the children's best interest.

In determining the best interest of a child, several factors have been consistently considered, which were set out in the Texas Supreme Court's opinion of *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).  This list is not exhaustive but simply identifies factors that have been or could be pertinent in the best-interest determination.  *Id.* at 372.  There is no requirement that all these factors be proven as a condition precedent to parental termination.  *See C.H.*, 89 S.W.3d at 27.  The absence of evidence about some factors does not preclude a factfinder from reasonably forming a strong conviction that termination is in the children's best interest.  *Id.*  In fact, while no one factor is controlling, the analysis of a single factor may be adequate in a particular situation to support a finding that termination is in

the children's best interest. *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

The *Holley* factors focus on the best interest of the children, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regul. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). And evidence relating to the predicate grounds under subsection 161.001(b)(1) may be relevant to determining the best interest of the children. *See C.H.*, 89 S.W.3d at 28.

Here, Kahn testified that she believes that Mother loves her children and would like her children returned to her possession. The evidence further showed that Mother worked on completing her services, including taking some parenting classes and substance abuse classes. Additionally, after initially testing positive on her hair-follicle drug test in November 2023, Mother tested negative on all further drug tests.

On the other hand, evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."); *see also In re V.A.*, No. 13-06-00237-CV, 2007 WL 293023, at *5–6 (Tex. App.—Corpus Christi–Edinburg Feb. 1, 2007, no pet.) (mem. op.) (considering parent's past history of unstable housing, unstable employment, unstable relationships, and drug usage). And we have already concluded above that the evidence was legally

and factually sufficient to establish that Mother engaged in conduct that endangered the physical or emotional well-being of the children. Furthermore, the evidence showed that Mother was living in a tent when she was arrested in April 2024. Mother was then incarcerated from that time until the time of trial in October 2024 and remained incarcerated at the time of trial. Mother's last visit with B.S. and R.S. was therefore on April 10, 2024, and Kahn explained that she would not be able to place the children with Mother at the time of trial because there was nowhere for Mother to take the children.

Alternatively, Kahn testified that B.S. and R.S. were in a foster placement together in Johnson County at the time of trial and were doing "exceptionally well." B.S. and R.S. were only four and two years old, respectively, at the time of trial—too young to express their desires. Kahn explained that when B.S. was first removed from Mother's and Father's care, he was unable to communicate or express any of his needs; however, because of the foster parents and their diligence with B.S.'s appointments, B.S. was in a "really great place" by the time of trial where he only required behavior therapy and some speech therapy. There were initial concerns that B.S. may have a form of autism, and the pediatrician recommended that they wait, continue services for B.S., and then retest him. But because B.S. had excelled and developed so much over the past year while in the care of the foster parents, there was no need to retest B.S. B.S. was still delayed in his speech,

which they were continuing to work on, but he was otherwise developmentally on target for a four-year-old. Likewise, R.S. was "pretty far behind" developmentally when the children were first removed from Mother's and Father's care. R.S. had bowlegs and had to have physical therapy for several months. However, at the time of trial, R.S. had graduated from physical therapy and was only required to wear braces on her ankles. R.S. was also potty-training and able to express what she needs. She was developmentally on target for her age. Thus, if Mother's and Father's parental rights were terminated, the plan was to move forward with the current placement to achieve adoption.

There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). However, considering all the evidence here in the light most favorable to the trial court's finding and considering the evidence as a whole, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interest. Accordingly, we overrule Mother's fifth issue.

## B. Motion to Extend

In her sixth issue, Mother contends that the trial court erred in denying her motion to extend the dismissal deadline of the case. We review a trial court's decision to deny an extension of the dismissal date under an abuse-of-

discretion standard. *In re A.J.M.*, 375 S.W.3d 599, 604 (Tex. App.—Fort Worth 2012, pet. denied).

Section 263.401 of the Family Code provides in pertinent part:

(a) Unless the court has commenced the trial on the merits or granted an extension under Subsection (b) or (b-1), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court's jurisdiction over the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child is terminated and the suit is automatically dismissed without a court order. . . .

(b) Unless the court has commenced the trial on the merits, the court may not retain the suit on the court's docket after the time described by Subsection (a) unless the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child. If the court makes those findings, the court may retain the suit on the court's docket for a period not to exceed 180 days after the time described by Subsection (a).

. . . .

(b-2) When considering under Subsection (b) whether to find that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department for a case in which the court orders a parent to complete a substance abuse treatment program, the court shall consider whether the parent made a good faith effort to successfully complete the program.

(b-3)  A court shall find under Subsection (b) that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department if:

(1)  a parent of a child has made a good faith effort to successfully complete the service plan but needs additional time; and

(2)  on completion of the service plan the court intends to order the child returned to the parent.

TEX. FAM. CODE ANN. §263.401.

Mother contends that the trial court erred in finding that no extraordinary circumstances existed to necessitate that B.S. and R.S. remain in the temporary managing conservatorship of DFPS. Mother argues that the trial court should have found extraordinary circumstances due to her "incarceration and her great efforts to take every class offered during her incarceration." But "[a] parent's [confinement or] incarceration is generally considered to be the parent's fault and not an extraordinary circumstance." *In re M.S.*, 602 S.W.3d 676, 680 (Tex. App.—Texarkana 2020, no pet.) (quoting *In re A.S.*, No. 12-16-00104-CV, 2016 WL 5827941, at *2 (Tex. App.—Tyler Sept. 30, 2016, no pet.) (mem. op.)). "Further, when a parent, through her own choices, fails to comply with a service plan and then requests an extension of the statutory dismissal date in order to complete the plan, the trial court does not abuse its discretion by denying the extension." *A.S.*, 2016 WL 5827941, at *2. Here, a major reason why B.S. and R.S. came into DFPS's care was

substance abuse. Yet even in the months before Mother was incarcerated, she was failing to attend substance abuse treatment. Mother completed her substance abuse assessment but was then discharged from two different substance abuse treatment programs for not attending.

Therefore, we conclude that the trial court did not abuse its discretion in finding that no extraordinary circumstances existed and in denying Mother's motion to extend the dismissal deadline. *See* TEX. FAM. CODE ANN. §263.401. Mother's sixth issue is overruled.

## Father's Appeal

Father's counsel has filed an *Anders* brief, asserting that he diligently reviewed the record and that, in his opinion, the appeal is frivolous. *See Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967); *In re E.L.Y.*, 69 S.W.3d 838, 841 (Tex. App.—Waco 2002, order) (per curiam) (applying *Anders* to termination appeal). Counsel's brief meets the requirements of *Anders*; it presents a professional evaluation demonstrating why there are no arguable grounds to advance on appeal. *See In re Schulman*, 252 S.W.3d 403, 406 n.9 (Tex. Crim. App. 2008) ("In Texas, an *Anders* brief need not specifically advance 'arguable' points of error if counsel finds none, but it must provide record references to the facts and procedural history and set out pertinent legal authorities."); *Stafford v. State*, 813 S.W.2d 503, 510 n.3 (Tex. Crim. App. 1991). Father's counsel has carefully discussed why, under controlling

authority, there is no reversible error in the trial court's order of termination. Counsel has informed us that he has examined the record and found no arguable grounds to advance on appeal, served a copy of the *Anders* brief on Father, informed Father of his right to review the appellate record and to file a *pro se* response, provided Father with a form motion for *pro se* access to the appellate record, and notified Father of his right to request counsel to file a petition for review on his behalf with the Texas Supreme Court should we declare his appeal frivolous. *See Anders*, 386 U.S. at 744, 87 S.Ct. at 1400; *Kelly v. State*, 436 S.W.3d 313, 319–20 (Tex. Crim. App. 2014); *Stafford*, 813 S.W.2d at 510 n.3; *High v. State*, 573 S.W.2d 807, 813 (Tex. Crim. App. [Panel Op.] 1978); *see also Schulman*, 252 S.W.3d at 408–09. By letter, we also notified Father of his right to review the appellate record and to file a *pro se* response and informed Father how to obtain a copy of the appellate record if he wished to obtain it. Father has not filed a *pro se* response.

Upon receiving an *Anders* brief, we must conduct a full examination of all the proceedings to determine whether the appeal is wholly frivolous. *Penson v. Ohio*, 488 U.S. 75, 80, 109 S.Ct. 346, 349–50, 102 L.Ed.2d 300 (1988). An appeal is "wholly frivolous" or "without merit" when it "lacks any basis in law or fact." *McCoy v. Court of Appeals*, 486 U.S. 429, 438 n.10, 108 S.Ct. 1895, 1902 n.10, 100 L.Ed.2d 440 (1988). We have reviewed the entire record and counsel's brief and have found nothing that would arguably support an

appeal.[1] *See Bledsoe v. State*, 178 S.W.3d 824, 827–28 (Tex. Crim. App. 2005) ("Due to the nature of *Anders* briefs, by indicating in the opinion that it considered the issues raised in the briefs and reviewed the record for reversible error but found none, the court of appeals met the requirements of Texas Rule of Appellate Procedure 47.1."); *Stafford*, 813 S.W.2d at 509.

## Conclusion

In light of the foregoing, we affirm the trial court's order of termination.[2]

---

[1] Father's counsel reviewed the sufficiency of the evidence supporting the trial court's findings under subsections 161.001(b)(1)(D) and (E) and determined that it would be frivolous to attack the findings. We also conclude that the evidence is sufficient to establish that Father violated subsection (E). *See N.G.*, 577 S.W.3d at 237 (holding due process and due course of law requirements mandate appellate court detail its analysis if appellate court affirms termination on either subsection (D) or (E)). As stated above, many factors can support an endangerment finding, including a parent's failure to complete a court-ordered service plan, missed visits with the child, and conduct that generally subjects a child to a life of instability and uncertainty. *A.R.M.*, 593 S.W.3d at 371–72. A parent's failure to remain drug free while his rights to his child are in jeopardy may also support a finding of endangering conduct under subsection (E). *See Vasquez v. Tex. Dep't of Protective & Regul. Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). Here, in addition to the evidence detailed above, the evidence showed regarding Father specifically that after the children were removed from Mother's and Father's care and the service plans were developed, Father set up several classes required by the service plan, but he did not attend those classes or otherwise complete any of the service plan. Father was also in and out of jail during the pendency of this case. On one occasion in February 2024, after just being released from jail, Father participated in a visit with B.S. and R.S. Father's visits were then placed on hold, however, because Father took a hair-follicle drug test that was positive. Father explained to Khan at that time that he had ingested methamphetamines while incarcerated after trading commissary for the drugs. In April 2024, Father was then incarcerated again and remained incarcerated at time of trial in this case in October 2024. The February visit with B.S. and R.S. was therefore Father's sole visit with the children after the children's removal from Mother's and Father's care.

[2] We also remind Father's appointed appellate counsel that if Father, after consulting with counsel, desires to file a petition for review, counsel is still under a duty to timely file with the Texas Supreme Court "a petition for review that satisfies the standards for an *Anders* brief." *In re P.M.*, 520 S.W.3d 24, 27–28 (Tex. 2016) (per curiam); *see In re G.P.*, 503 S.W.3d 531, 535 (Tex. App.—Waco 2016, pet. denied); *see also* TEX. FAM. CODE ANN. § 107.016.

_____

MATT JOHNSON
Chief Justice

OPINION DELIVERED and FILED: March 27, 2025

Before Chief Justice Johnson,
     Justice Smith, and
     Justice Harris
Affirmed
[CV06]

